# STATE OF MICHIGAN

# COURT OF APPEALS

In re TORRES/HENDERSON, Minors.

UNPUBLISHED
May 10, 2018

No. 337445
Oakland Circuit Court
Family Division
LC No. 2014-821893-NA

Before: BORRELLO, P.J., and SAWYER and JANSEN, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her children, MCTT, RSHT, and JAH, pursuant to MCL 712A.19b(3)(c)(*ii*), (g) , and (j). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

In a petition dated July 18, 2014, petitioner sought temporary jurisdiction over mother's three minor children based on allegations that mother was currently hospitalized due to a suicide attempt and that the children had been left without proper care and custody. The petition alleged that mother had attempted to commit suicide on June 22, 2014, by taking prescription drugs; that the three minor children were present during the suicide attempt; that MCTT witnessed mother taking the drugs; and that Teneesha Fields, a Child Protective Services (CPS) worker, had found mother lethargic and unable to supervise or care for her children. The petition further alleged that there was a history of domestic violence between mother and J. Henderson, who was the alleged biological father of JAH.[1] According to the petition allegations, there was currently a no-contact order in place, and the most recent domestic violence incident had occurred in front of RSHT.

At the probable cause hearing, Brittany Myree, a CPS worker, testified that CPS had already been involved with the family since January 2014 based on issues of domestic violence between mother and Henderson. A no-contact order prohibiting contact between mother and Henderson was already in effect. The minor children had been placed together in a non-relative licensed foster home since June 24, 2014.

---

[1] A different man was the legal father of JAH.

-1-

The trial court subsequently assumed jurisdiction over the minor children pursuant to mother's no-contest plea to the allegations in the petition. At the plea hearing, foster-care worker Joseph Kehrer-Scharphorn indicated that mother's parenting time was going well and that the children were always excited to see mother and were bonded with her. However, Kehrer-Scharphorn also explained that he had been having issues with Henderson coming to visits. At a recent visit, mother had contacted Henderson to bring swimsuits and towels so the children could play on water slides in the park. Henderson delivered the items and wanted to stay longer for the visit, but Kehrer-Scharphorn informed him that he could not participate in mother's visits. At another recent visit, Henderson walked mother to the visit. According to Kehrer-Scharphorn, RSHT and JAH viewed Henderson as a father, and it was difficult for the children to see him when they knew that he could not participate in the visit. Fields indicated that Henderson was not to be at mother's parenting time visits because mother and Henderson had a long history of domestic violence and were not appropriate together. Mother claimed that the no-contact order had been lifted.

At the initial dispositional hearing, Kehrer-Scharphorn explained that the parent-agency agreement and initial service plan recommended that mother participate in reunification services to meet three goals: (1) achieve emotional stability; (2) demonstrate appropriate parenting skills; and (3) maintain a legal source of income and appropriate housing. To achieve emotional stability, Kehrer-Scharphorn recommended that mother continue the services she was already receiving through Easter Seals. These were psychiatric services, psychiatric medication, individual therapy, and "therapy specific to domestic violence" due to the reported domestic violence incident with Henderson. Mother would also be required to complete a psychological evaluation. Mother's demonstration of appropriate parenting skills would be accomplished by participation in parenting classes and parenting time visits. With respect to the third goal, mother stated that she was receiving Supplemental Security Income (SSI), food stamps, and Section 8 housing assistance. The court adopted the parent-agency agreement.

The case proceeded, and on January 22, 2016, the trial court entered an order permitting the minor children to be returned to mother under the continued supervision of the Department of Health and Human Services (DHHS).

However, on May 19, 2016, CPS worker Rita Pierce-Gonzalez filed a supplemental petition seeking to terminate mother's parental rights to the three minor children pursuant to MCL 712A.19b(c)(*ii*), (g), and (j). The petition alleged that mother continued to have contact with Henderson despite the existence of an active personal protection order (PPO) against Henderson, that mother was approximately four months pregnant by Henderson, and that there was an incident of domestic violence involving mother and Henderson on May 11, 2016. The petition alleged that the children were present during the May 11 incident and that Henderson was arrested following the incident. According to the petition allegations, mother had been allowing a homeless man to live in her basement without permission of the court or the DHHS. The petition also alleged that mother failed to benefit from services aimed at addressing parenting skills, mental health, and domestic violence because she placed the children at further risk of harm by continuing to have contact with Henderson.

At a hearing on May 20, 2016, Pierce-Gonzales testified that the DHHS had told mother that she was not to have contact with Henderson because of the extensive history of domestic

violence occurring in the home between mother and Henderson while in the presence of the children. Pierce-Gonzales further testified that there was an active PPO. Specifically, on May 11, 2016, Henderson arrived at mother's residence and asked to use her van. She refused, and a physical struggle ensued during which mother and Henderson ended up on the basement floor wrestling over the keys. All of the children were present in the home. Henderson broke mother's cell phone, so mother called the police from a neighbor's house. Henderson was arrested after he left the residence. According to Pierce-Gonzales, Family Reunification Program (FRP) workers subsequently discovered a bed, men's shoes, men's clothes, and a beer bottle in the basement of mother's home. Mother admitted to Pierce-Gonzales that she was currently pregnant and that Henderson was the father. Henderson told Pierce-Gonzales that he had been coming to mother's home every day while MCTT, RSHT, and JAH were at school. Henderson had also brought a friend who was homeless to mother's home. The DHHS did not know about the presence of these two men in mother's home. Pierce-Gonzales testified that she was seeking to have the children removed from the home due to the ongoing domestic violence in front of the children, which put them at risk of harm. The trial court entered an order finding that it was necessary to remove the children from mother's care and take them into protective custody.

However, mother left Michigan with her children before the removal order was carried out. She was subsequently located in Florida with the children, and two CPS workers brought the children back to Michigan. MCTT, RSHT, and JAH were placed in the foster home where they had been placed previously.

The termination hearing began on August 29, 2016. Henderson testified that he was currently in jail. Henderson stated that he was the biological father of two of mother's children: JAH and another child who was nine months old.[2] With respect to the May 11, 2016 incident, Henderson explained that he had been staying at a homeless shelter, and he went to mother's house that day to change his clothes and to borrow her van to go to work the next day. According to Henderson, mother told him to leave because she did not want her children to know that he was there. Henderson testified that mother did not want the children to know about his presence because Henderson was not supposed to be at mother's house and mother could get in trouble with the DHHS. Henderson was with his friend from the homeless shelter, J. Worboys.

Henderson testified that he asked mother for the keys to the van, and she told him to leave. They were both standing on the stairs. According to Henderson, he and respondent both fell down the stairs when he dropped his phone while reaching for the keys. Henderson testified that the children did not see the incident. He did not know which children were home, but he saw MCTT and JAH. Henderson denied knowing about a PPO prohibiting his contact with mother. Henderson indicated that neither he nor Worboys stayed or lived in mother's basement. The police told him that mother was pregnant when he was arrested on May 11, 2016. He did not know who the father was.

---

[2] This minor child, who was born during the course of the proceedings in this case, is not a subject of the instant appeal.

Corey Bauman, a Southfield police officer, testified that he was dispatched to mother's home on May 11, 2016. According to Bauman, mother appeared upset and ashamed, and she was evasive when he questioned her. Mother also appeared disheveled, with marks on her face and "slight bleeding." Bauman testified that mother tried to cover her mouth and nose with her hand to prevent him from photographing her injuries and that mother was reluctant to prosecute Henderson. Mother told Bauman that night that Henderson pushed her down the stairs because she would not allow him to take her car keys. She stated that Henderson broke her cell phone when she tried to call 911, but she was able to call the police on her land line phone. Bauman stated that four children, including a baby, were present in the home that night, and mother was pregnant. Henderson testified that the children seemed shocked and confused.

MCTT testified that she was 12 years old and that when she and her siblings first returned to mother's home after being in foster care, MCTT and her siblings were the only people living in the house with mother. Initially, mother "was nice," but eventually "she started kind of to get back how she was when before we even got into foster care." According to MCTT, mother was "mean" to her and her siblings sometimes. MCTT testified that after they had been living with mother for approximately a month or two, Henderson moved in with them. Henderson stayed in the basement. MCTT told mother this was a bad idea because mother and Henderson had fought in the past. Mother told MCTT that Henderson had changed, but MCTT did not believe this. MCTT had seen Henderson hit mother with a shoe and other objects in the past. Mother sometimes called the police during these incidents. MCTT felt sad and scared when she saw Henderson hit mother. MCTT testified that Worboys had also been staying at their house with Henderson. According to MCTT, Mother warned MCTT not to tell Kehrer-Scharphorn or CPS about Henderson and Worboys.

MCTT testified that on the evening of May 11, 2016, mother and Henderson began arguing. MCTT went outside and then heard mother say "ow" and then ask why Henderson had hit her. MCTT went back inside and saw Henderson and mother go into the basement. They were still arguing. MCTT stayed upstairs, but she heard yelling and arguing. MCTT testified that at some point after mother and Henderson came back upstairs, Henderson pushed mother down the basement stairs. MCTT ran down to the basement and saw mother on the floor with Henderson on top of her. RSHT and JAH were screaming, and Worboys was trying to get Henderson off mother.

MCTT testified that mother took the children to Florida approximately three weeks later because she anticipated that CPS was going to remove the children from her care. MCTT told mother this was a bad idea because they would be found eventually, but mother said they would not get caught. One week later, the police located the family in Florida, and the children were returned to Michigan.

The foster father for MCTT, RSHT, and JAH testified that the children had been placed with him and his wife from June 2014 until they were returned to mother in January 2016. The children were placed in the foster home again beginning in May 2016. The children were happy to return to the foster parents' home in May 2016. The foster father stated that the children were bonded with him and his wife and that he and his wife were interested in adopting the children if mother's parental rights were terminated. The foster father described the children's present state as anxious because they did not understand what was going on.

Kehrer-Scharphorn testified regarding the parent-agency agreement he prepared for mother in July 2014. Mother's greatest deficiencies were domestic violence and emotional instability. Before the original petition was filed, there had been ongoing CPS services provided to the family based on domestic violence issues between mother and Henderson. Pursuant to the July 2014 parent-agency agreement, mother was offered services to address her emotional stability, including continuation of case management services, individual therapy, psychiatric services, and domestic violence services.

Additionally, Kehrer-Scharphorn prepared a safety plan of actions mother would take to avoid dangerous situations involving domestic violence. The plan required her to call the police if Henderson came to the house. Mother also was required to report any incidents to Kehrer-Scharphorn. According to Kehrer-Scharphorn, Henderson and mother's history of domestic violence dated back to 2012. Kehrer-Scharphorn obtained police reports for domestic violence reports at mother's address involving Henderson, and he learned that there had been a domestic violence incident on the night before the children were returned to mother in January 2016. He asked mother why she did not report this incident to him, and she told him that it was not relevant to the care of her children because they were not present.

Sylvie Bourget, a clinical psychologist employed by Oakland County Circuit Court Psychological Clinic, evaluated respondent, MCTT (then 12 years old), RSHT (seven years old), and JAH (six years old) in August 2016. MCTT told Bourget that she was happy in her foster care placement and did not want to go back to mother's care. MCTT indicated multiple times that she wanted to testify against her mother in court because she was tired of mother's repeated bad choices and frequent lies. According to Bourget, MCTT was also concerned about her own safety as well as the safety of her younger siblings, especially the new infant. MCTT said that when she had visitation with mother and her younger half siblings, MCTT had to take care of the baby. MCTT indicated that mother was mean to the baby and that when the baby cried, mother put the baby on the bed and yelled at the baby. Additionally, MCTT told Bourget that she did not feel safe due to the violence in the home and seeing Henderson hurt mother.

According to Bourget, RSHT also reported that he was happy in his placement, and JAH indicated that he felt safe in his foster placement. RSHT indicated that he did not feel safe and that his mother did bad things. Bourget testified that she asked JAH to draw a picture of his family. He included his foster parents and his siblings who were placed with him in the foster home, but he did not include mother. Bourget testified that this indicated an emotional separation from mother and attachment to the individuals who had been caring for him. Bourget further testified that both boys showed aggression when they were placed in foster care, but their behavior had improved after the placement. Bourget observed the three children together and noted that they were very bonded to each other and that MCTT tended to take on a parental role with her younger brothers.

With respect to her evaluation of mother, Bourget testified that mother did not display any insight about the concerns caused by her relationship with Henderson. Bourget explained that she had no reasonable expectation that mother could properly care for the children if they were returned to her care and services were continued because "despite the number of years of intervention, [mother] continued to make bad choices and put her children at risk, especially by remaining involved with a severely abusive individual." According to Bourget, the children

were at risk of suffering emotional abuse from witnessing the domestic violence between Henderson and mother.

Mother testified that Henderson was the father of JAH and mother's fourth child who was born during the pendency of the instant proceedings. Mother further testified that Henderson was possibly the father of her fifth child, who was born in October 2016.[3] She admitted that there was a history of domestic violence with Henderson. With respect to the May 11, 2016 incident, mother testified that she and Henderson "had a little altercation" and "both fell down the stairs." She told Henderson to leave when he initially arrived at the house, and he refused to leave. According to mother, she called the police pursuant to her safety plan after she was able to get free from Henderson. Mother also admitted that she had an active PPO against Henderson at the time.

The trial court terminated mother's parental rights to MCTT, RSHT, and JAH pursuant to MCL 712A.19b(3)(c)(*ii*), (g), and (j). The trial court set forth its specific findings of fact and conclusion of law in a written opinion and order. This appeal followed.

## II. STATUTORY GROUNDS

On appeal, mother first argues that the trial court erred in finding that the statutory grounds for jurisdiction were established by clear and convincing evidence.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). This Court "review[s] for clear error [] the court's decision that a ground for termination has been proven by clear and convincing evidence . . . ." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000), abrogated by statute on other grounds as stated in *In re Moss*, 301 Mich App 76, 83, 88; 836 NW2d 182 (2013). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

Under MCL 712A.19b(3)(g), parental rights may be terminated if "[t]he parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age."

---

[3] Mother gave birth to her fifth child in October 2016. At a November 30, 2016 hearing, which was a continuation of the termination hearing, mother indicated that the child was born in Georgia and claimed that the child was currently with a relative in Puerto Rico. The baby was located on approximately December 13, 2016, in Florida with a relative and taken into protective custody. This child is not a subject of the instant appeal.

In this case, the trial court found that termination was proper under MCL 712A.19b(3)(g) because mother had exposed the children to domestic violence by continuing to allow Henderson to live in the family home and be part of the children's lives. The trial court further found that mother demonstrated that she wanted to maintain a relationship with Henderson, that mother continued this relationship with Henderson in violation of the parent-agency agreement and court orders, that she instructed her children to lie to CPS workers about mother's contact with Henderson, and that mother disregarded the safety of herself and her children in taking this course of action.

The record evidence supports the trial court's findings. There was testimony that the minor children were at risk of harm from the repeated exposure to domestic violence between mother and Henderson, and there was evidence that the violence in the home caused MCTT to feel sad and scared. There was further testimony that MCTT worried about her safety and the safety of her siblings. Additionally, mother maintained a relationship with Henderson during the pendency of these proceedings, conceiving at least one child with him during that time, despite the active PPO against Henderson and the instructions from case workers not to have contact with Henderson due to the history of domestic violence. Furthermore, there was a domestic violence incident between mother and Henderson in January 2016 that mother did not report to Kehrer-Scharphorn, contrary to her safety plan. And there was evidence that within a relatively short time after the children were returned to her care, mother allowed Henderson to move in to the home, or to at least frequent the residence, and mother instructed MCTT to keep this fact secret. Another domestic violence incident occurred in the presence of the children on May 11, 2016. These child-protective proceedings progressed over the course of more than two years, with the minor children living in foster care for all but approximately four months of that time. The record reflects that domestic violence between mother and Henderson was an issue at the time the children were first removed and continued to be an issue through the pendency of these proceedings. Thus, we conclude that the trial court did not clearly err by determining that mother had failed to provide proper care and custody and could not reasonably be expected to do so within a reasonable time based on mother's pattern of maintaining a relationship with Henderson that caused the children to be exposed to domestic violence. *In re Moss*, 301 Mich App at 80.

Because at least one statutory ground existed to properly support termination, we need not consider the additional grounds relied upon by the trial court. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

### III. BEST INTERESTS

Mother also argues that the trial court erred in finding that termination of her parental rights was in the children's best interests.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. We review a trial court's best-interests determination for clear error. *In re Trejo*, 462 Mich at 356-357.

At the best-interest stage, the focus is on the child and not the parent. *In re Moss*, 301 Mich App at 87. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). Other factors include the length of time that the minor child was in foster care or placed with relatives and the likelihood that the child could be returned to the parents' home within the foreseeable future. *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

In this case, the trial court's determination that termination was in the best interests of the minor children was based on the trial court's findings that the children did not have a significant bond with mother; that mother lacked stability; and that the children experienced stability in the care of their foster parents, with whom the children were bonded. With respect to the bond between the minor children and mother, the trial court found that the children had been removed from mother's care for the majority of the previous two years, that mother was mean to the children after Henderson began staying at the home, that MCTT had advised mother not to allow Henderson to stay in the home, and that MCTT had indicated she did not want to return to mother's care. With respect to mother's stability, the trial court found that mother continued to associate with an abusive individual and fled to Florida twice to avoid CPS. Finally, the trial court noted the length of time that the children had been placed with their foster parents and the consistency that this setting provided. All of these findings are well supported by the testimonial record, and we conclude that the trial court did not clearly err by finding that termination was in the minor children's best interests. *In re Trejo*, 462 Mich at 356-357.

Additionally, although the trial court specifically referenced each of the three minor children in explaining its best-interests findings, mother nonetheless argues on appeal that the trial court erred by not considering the best interests of each child individually. However, the three minor children were all placed together in the same foster home, and there was no significant difference in the best interests of each of the minor children with respect to their relationships with mother. The children had been out of mother's care for most of the previous two years and they all needed the stability and finality that could be provided by terminating mother's parental rights and permitting the children to remain in the foster home. *In re Olive/Metts Minors*, 297 Mich App at 41-42. Because the best interests of the individual children did not significantly differ, the trial court had no obligation to make explicit individual best-interests findings regarding each child. *In re White*, 303 Mich App at 715-716.

Affirmed.

/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Kathleen Jansen